**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                  CIV. No. 05-64 ACT/WDS

$37,484 IN U.S. CURRENCY,

    Defendant,

EDDIE LEE DINGLE,

    Claimant.

**MEMORANDUM OPINION AND ORDER**

      THIS MATTER comes before the Court on the Plaintiff United States of America's (United States) Motion for Summary Judgment. [Doc. No. 37]. The United States has stated that the Claimant Eddie Lee Dingle (Claimant or Dingle) opposes the Motion but the Claimant never filed a responsive pleading to the Motion for Summary Judgment. Claimant's Response is now approximately thirty days overdue. Despite the lack of a responsive pleading from the Claimant and in light of the fact that Claimant is now proceeding *pro se*, this Court will treat the Motion as opposed and review the pleadings and evidence presented in this case in light of the requirements of Fed. R. Civ. P. 56. Having reviewed the pleadings, the evidence presented in this case and the relevant case law, the Court finds that the Motion for Summary Judgment is well taken and will be GRANTED to the Plaintiff, the United States of America. The Defendant, $37,484.00 in

currency, is FORFEITED to the Plaintiff under 21 U.S.C. §881(a)(6). A Judgment and Order dismissing this case with prejudice is entered separately.

Summary Judgment is granted when the material facts are not in dispute and the moving party is entitled to judgment as matter of law. Fed. R. Civ. P. 56(c). The moving party has the initial burden of showing there is no genuine issue of material fact. Once the moving party meets its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories and admissions on file', designate 'specific facts showing that there is a genuine issue for trial'." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion may not rest on the allegations or denials contained in the pleadings but must set forth specific facts showing a genuine issue of trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 256 (1986). Unsupported allegations, conclusory in nature, are not sufficient to defeat a motion for summary judgment. Id., at 248. If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

This is a case where the Court must look to the record as a whole. The Court concludes, looking at all the evidence presented in this case that no rational trier of fact could find for the Claimant and that there is no genuine issue of material fact for trial. The record, as a whole, also demonstrates that the United States has established by a preponderance of the evidence that the Defendant currency was furnished or intended to be furnished in exchange for a controlled substance, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of the controlled Substances Act. See, 21 U.S.C. §881(a)(6).

Therefore, summary judgment is GRANTED to the moving party, the United States.

## UNDISPUTED MATERIAL ISSUES OF FACT

The undisputed facts, established by the record, are as follows:

1. On August 11, 2004, at approximately 10:30 PM, the Dingle and a companion, Michael Adrian Stitts, drove into a United States Border Patrol checkpoint located on Interstate 10 north of Las Cruces, New Mexico. Dingle was driving and Mr. Stitts was a passenger in the front seat. [Declaration of Agent Hernandez, Doc. No. 34].

2. Agent Salvador Hernandez, a United States Border Patrol agent, approached the Cadillac and asked both men their citizenship. Both men answered that they were United States citizens. Agent Hernandez asked them where they were coming from and where they were headed. Dingle responded that they were coming from Louisiana and driving to California. [Declaration of Agent Hernandez, Doc. No. 34].

3. Agent Hernandez has been a United State Border agent for four years. His duties include investigation of violations of immigration laws. He has also been trained to investigate controlled substance violations and has participated in numerous arrests and criminal prosecutions of drug related activities. [Declaration of Agent Hernandez, Doc. No. 34].

4. Agent Hernandez noticed that Dingles' hands were shaking and that he seemed to be in a hurry to drive out of the checkpoint. The agent asked permission to conduct a canine inspection of the car but Dingle responded that he did not wish to have such an inspection. [Declaration of Agent Hernandez, Doc. No. 34].

5. Due to Dingle's nervousness, Agent Hernandez directed Dingle to drive his car to a

secondary inspection area. [Declaration of Agent Hernandez, Doc. No. 34]. Agent Aleman was working at the secondary inspection area and asked the two men to step out of the car. [Declaration of Agent Hernandez, Doc. No. 34].

    6. Agent Rudy P. Sanchez, a United States Border Patrol agent, was also working at the secondary inspection area. Agent Sanchez has been a United States Border Patrol agent for ten years. His duties include investigations of violations of immigration laws. He is also a trained drug detection canine handler and has participated in numerous arrests and criminal prosecutions of drug related activities. [Declaration of Agent Sanchez, Doc. No. 35].

    7. During the evening of August 11, 2004, Agent Sanchez was handling a trained and certified drug detection canine named Daisy. Daisy was certified on that date to detect the odors of marijuana, cocaine, methamphetamine and heroin. [Declaration of Agent Sanchez, Doc. No. 35].

    8. Agent Sanchez directed Daisy to perform an inspection of the Cadillac and the dog alerted positively on the car for the odor of illegal controlled substances. [Declaration of Agent Sanchez, Doc. No. 35].

    9. Agent Aleman and Agent Sanchez inspected the car and found a large ziplock bag wrapped in a black t-shirt on top of the car battery in the engine compartment. Inside the bag the agents found several bundles of United States currency in various denominations. The currency was wrapped in rubber bands and a strong odor of marijuana emanated from the currency. [Declaration of Agent Sanchez, Doc. No. 35].

    10. Special Agent Jared Johnson has been a Special Agent with United States Drug Enforcement Administration for approximately three years. He was previously employed for

seven years as a police officer with the State of Utah.  He has personally conducted or supervised several hundred investigations of violations of the Controlled Substances Act which have resulted in the successful criminal prosecutions of numerous individuals and the forfeiture of currency and other assets involved in drug trafficking activities. [Declaration of Agent Johnson, Doc. No. 36].

11.   On August 11, 2004, Agent Johnson received a request for assistance at the Interstate 10 checkpoint by the United States Border Patrol.  Agent Johnson, together with Agent Darren Rhoden, responded at approximately 12:30 AM on August 12, 2004. [Declaration of Agent Johnson, Doc. No. 36].

12.   Agent Johnson learned that the Border Patrol Agents had located a large amount of currency, later determined to be $37,484.00, in the engine compartment of the Cadillac. [Declaration of Agent Johnson, Doc. No. 36].

13.   Agent Johnson advised Dingle of his Miranda rights using a DEA form. Dingle stated that he understood his rights and agreed to speak with agents.  [Declaration of Agent Johnson, Doc. No. 36].

14.   Dingle said that he had won $45,000 while gambling in East St. Louis, Missouri.  The money found in the car was the remaining balance of his winnings.  Dingle could not provide the name of the casino or its location.  He also stated that the casino did not require him to fill out any tax forms because he did not have a local checking account in Missouri and two forms of picture identification. He told agents that he had purchased the Cadillac for $5000 and had wired Mr. Stitts $300 to purchase a plane ticket from Arizona to St. Louis.  Dingle said he wanted Mr. Stitts to help him drive the car from St. Louis to Arizona.  Dingle said he had placed the remaining cash in the engine compartment to conceal it from anyone who might try to rob him. [Declaration of

5

Agent Johnson, Doc. No. 36].

15. Dingle stated that he lived in Tucson, Arizona with Kimberly Molina. Agent Johnson called a number that Dingle gave him for Ms. Molina. A woman answered who stated that she was Ms. Molina's mother. Ms. Molina called Agent Johnson about 15 minutes later and told the agent that Dingle had won $3,000 while gambling at a casino in St. Louis and that she had won $600. [Declaration of Agent Johnson, Doc. No. 36].

16. Dingle and Mr. Stitts were released from custody. Immediately following his release, Dingle made a call on his cellular phone. Shortly thereafter, Agent Johnson received a second phone call from Ms. Molina. She stated that she had been with Dingle when he had won the $3,000 but then left St. Louis for Tucson. She said that she forgot to tell Agent Johnson that after she arrived in Tucson, Dingle called her and told her that he had won a larger amount of money. [Declaration of Agent Johnson, Doc. No. 36].

17. Agent Johnson stated that based upon his experience as a law enforcement officer and his experience in the DEA that:

    a) drug couriers commonly transport and conceal bundled money and deliver bundled money for illegal controlled substances;

    b) drug couriers commonly transport currency on routes from the Eastern United States to source cities in border states like Arizona or New Mexico;

    c) Tucson, Arizona is a major source city for illegal controlled substances;

    d) drug couriers commonly use rubberbands instead of bank wrappers and that the use of rubberbands is consistent with the behavior of a courier of drug proceeds;

    e) the fact that the cash consisted of a large number (1,172) of $20 bills is

indicative of street level narcotic sales.[1] [Declaration of Agent Johnson, Doc. No. 36].

    18. Dingle responded in discovery that the money came from a combination of personal savings from work ($7,000), winnings from the Casino Queen ($12,000), and $18,000 from investments in his invention. [ Exhibit 5 to Motion for Summary Judgment, Doc. No. 37].

    19. Dingle filed federal tax returns showing adjusted gross income in 2001 of $10,901, in 2002 of $18,118, and in 2003 of $17,937. [Exhibit 3 to Motion for Summary Judgment, Doc. No. 37]. In December, 2005, after the seizure of the currency, Dingle filed a Motion and Declaration to proceed *in forma pauperis*. In support of his Motion, Dingle stated that he was employed at a restaurant in Tucson earning $8.00 an hour, was married with three dependents, owned no real estate, stocks or bonds, received no other income other than his hourly wage, did not have any cash, did not have a checking or a savings account, and only owned two older model cars. [Doc. No. 24].

    20. In the course of discovery, Dingle produced ten Joint Venture Agreements, all dated August 3, 2004, between Eddie L. Dingle, Inventor, and ten individuals, the Venturers. The individuals agreed to contribute amounts ranging from $5,000 to $1,000 in return for a percentage of royalties earned by the licensing or sale of the inventor's invention. [Exhibit B from Claimant, attached to Exhibit 4 to Motion for Summary Judgment, Doc. No. 37].

    21. In his deposition taken on February 7, 2006, Dingle invoked his Fifth Amendment rights each time he was asked to further identify the ten individuals who had signed the Joint Venture Agreements or explain who they were. Dingle also invoked the Fifth Amendment when

---

[1] Agent Johnson stated that the $37,484.00 consisted of 60 $100 dollar bills, 68 $50 dollar bills, 1,172 $20 bills, 232 $10 bills, 463 $5 bills and 9 $1 bills. [Declaration of Agent Johnson, Doc. No. 36].

asked whether the ten individuals named as Venturers gave him the money as stated in the Joint Venture Agreements. [Exhibit 4 to Motion for Summary Judgment, Doc. No. 37].

22.  Dingle also invoked his Fifth Amendment rights in his deposition when asked why he went to Illinois (apparently where he went first on this trip), when he went to Illinois, what he did while he was in Illinois, when he got to St. Louis, where he stayed in St. Louis, and what he did while he was in St. Louis after his girlfriend (now spouse) left with his children for Tucson.

## LEGAL ANALYSIS

Claimant Dingle is not facing criminal charges in connection with this stop and the seizure of the currency.  Dingle had a right to assert the Fifth Amendment in the course of discovery in this proceeding, which he did.  United States v. Two Parcel of Real Property Located in Russell County, Alabama, 92 F. 3d 1123 (11th Cir. 1996).  But the fact that the Claimant invoked the Fifth Amendment when questioned about the details of the Joint Venture Agreements, one of the alleged sources of the currency, and his activities in the days preceding the seizure of the currency, together with the fact that Dingle is not facing criminal charges, allows the Court to come to two conclusions.  United States v. $118,170.00 in U.S. Currency, 69 Fed. Appx. 714, 2003 WL 21659445 (6th Cir. 2003) (unpublished).

First, the Court is allowed to infer that the answers to the questions to which Dingle invoked the Fifth Amendment would have been adverse to his claim.  Specifically the Court may infer that Dingle's previous explanations as to the source of the currency are not true.  Therefore, the Court finds that the ten Joint Venture Agreements submitted by the Claimant as evidence of the source of $18,000 of the currency are not supported by any evidence and do not raise material

issues of fact.

Secondly, the Court may find that the assertion of Claimant's Fifth Amendment rights is not a substitute for evidence in support of Claimant's case in this Motion for Summary Judgment. Specifically, the assertion of Claimant's Fifth Amendment rights does not meet the requirement of a Fed. R. Civ. P. 56 that the non-moving party set forth specific facts showing that there is a genuine issue for trial. Id., at 718.

The Court also finds that Dingle's allegation that $7,000 of the currency represented his savings over a several year period to be unsupported by the evidence presented in this case. In light of the three tax returns, Dingle's declaration of poverty in 2005, the fact that he was supporting two children during this time on a stated income of approximately $18,000 a year and had a girlfriend/wife whom he also supported on this income, is evidence that does not support the allegation that $7,000 of the money was Dingle's personal savings. As in United States v. $174,206.00 in U.S. Currency, 320 F. 3d 658 (6th Cir. 2003), the Claimant's legitimate income was insufficient to explain the amount of currency that he claimed he was saving from his working wages. Therefore, the Court finds that even though Dingle has asserted in both written and oral discovery that $7,000 of the currency represented his savings, his allegation is unsupported and does not present a disputed material issue of fact.

Likewise, the claim by Dingle that $12,000 of the cash was from casino winnings is also unsupported by the evidence. Dingle was asked by the United States to produce the tax forms that casinos give to their successful gamblers. Dingle has never produced those forms and in fact, gave an explanation to the Border Patrol agent that is inconsistent with his later statements in discovery. Dingle's allegation that a substantial portion of the cash found in the Cadillac was

from his casino winnings is also unsupported by the evidence in this case and does not present a disputed material issue of fact.

When finding that Dingle's claims or allegations as to the sources of the cash do not rise to the level of disputed material issues of fact, the Court is not weighing Dingle's evidence against the other evidence presented in the case. Except for the ten Joint Venture Agreements, all dated August 3, 2004, and about which Dingle refused to answer questions, there has been no evidence presented to support Dingle's allegations about the sources of the money. His "evidence" is actually no more than "mere allegations or denials" similar to those in his pleadings. Fed. R. Civ. P. 56(e) explains that the non-moving party must do more than rest on his allegations but must present affidavits and other competent evidence setting forth facts that would be admissible at trial to support his allegations. If the non-moving party, in this case Claimant Dingle, is unable to present such evidence in response to a Motion for Summary Judgment , summary judgment, if appropriate, may be granted to the moving party. Fed. R. Civ. P. 56(e); <u>United States v. $30,670.00</u>, 403 F. 3d 448 (7th Cir. 2005).

<u>SUMMARY JUDGMENT SHOULD BE GRANTED TO THE PLAINTIFF</u>

Once the Court finds that there are no disputed material issues of fact left to be decided at trial, the next step in deciding a Motion for Summary Judgment is to determine if the moving party is entitled to judgment as a matter of law. The United States seeks to have the Defendant Currency forfeited under 21 U.S.C. §881(a)(6). The forfeiture statute allows currency to be forfeited if the United States can show, by a preponderance of the evidence, that the currency was "furnished or intended to be furnished by any person in exchange for a controlled substance or

listed chemical in violation of this subchapter ... [or] used or intended to be used to facilitate any violation of this subchapter." Id.

The United States asserts, and the Court agrees, that the totality of the evidence meets this burden. United States v. $242,484.00, 389 F. 3d 1149 (11th Cir. 2004)(en banc). The United States does not need to trace the property to any specific drug transaction but must only prove that a rational trier of fact would find that the seized currency was more likely than not related to some illegal drug transaction. Id., at 1160.

In coming to this conclusion, the Court relies on all the undisputed facts as a whole. If a trier of fact had been presented with just one or two of these facts, looked at in isolation, those facts may not lead a trier of fact to conclude that it was more likely than not that the cash was related to an illegal drug transaction. But in this case, the cumulative weight and totality of the facts invariably lead the Court to one reasonable conclusion - that this seized cash was connected to an illegal drug transaction. United States v. $30,670.00, 403 F. 3d 448, 467 (7th Cir. 2005).

Noteworthy to the Court are the following facts: 1) that Claimant has come forth with no legitimate, rational explanation for the large amount of money but instead gave false and inconsistent statement about the source of the money; 2) that Claimant was driving from the eastern part of the United States to Arizona, a route known by law enforcement officers to be used by drug or drug money couriers; 3) that Claimant was nervous and seemed to be in hurry to leave the checkpoint; 4) that Claimant hid the money in the engine compartment; 5) that the money was in a zip lock bag and wrapped in a t-shirt; 6) that the money was in small bills and rubberbanded together; 7) that a certified, trained drug detection dog alerted officers to the smell of drugs; 8) that according to the officers the smell of marijuana emanated from the money; 9)

11

that Dingle gave false and inconsistent statements about his and Mr. Stitts' travels; and 10) that Dingle invoked his rights under the Fifth Amendment when asked questions about his activities or the places he stayed while on his travels.

## CONCLUSION

There are no disputed material issues of fact in this case. The undisputed facts, when looked at as a whole, establish that it is more likely than not that the currency seized in this case from Claimant was connected to an illegal drug transaction. The Plaintiff United States of America has met its burden in this Motion for Summary Judgment both in establishing that there are no material issues of fact in dispute and that it is entitled to judgment as matter of law. Therefore, summary judgment is GRANTED IN FAVOR of the Plaintiff.

_____
ALAN C. TORGERSON
UNITED STATES MAGISTRATE JUDGE